IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **ROMIL RAFAEL ESTRELLA TAVERAS,** | : | |
| Plaintiff, | : | |
| v. | : | Case No. 05-CV-0867 |
| **CAROLYN R. PAIEWONSKY TAVERAS,** | : | JUDGE ALGENON L. MARBLEY |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

### I.  INTRODUCTION

This matter comes before the Court on Defendant's Motion to Dismiss for Lack of Jurisdiction.  For the following reasons, this Court finds it has no jurisdiction to hear this case and **GRANTS** Defendant's Motion to Dismiss [Docket No. 11].

### II.  FACTS and BACKGROUND

The facts as alleged in the Complaint are as follows.  Plaintiff Romil Rafael Estrella Taveras and Defendant Carolyn R. Paiewonsky Taveras are both citizens of the Dominican Republic.  They were divorced on December 22, 2004 and a Dominican Republic court granted Defendant guardianship of the couple's two children, Carolyn Rachel (DOB 5/12/97) and Romil Manuel (DOB 5/22/02).  Plaintiff characterizes Dominican Republic law, Title V, Chapter II, Article 204 of the New Code of Minor Law No. 136-03, as prohibiting either parent from removing the children without the written consent of the other parent.

On or about August 24, 2004, Defendant obtained oral consent from Plaintiff to take the children to Boston, Massachusetts for a two-week vacation. On September 8, 2004, Defendant informed Plaintiff, via telephone, that she would not be returning to the Dominican Republic and that Plaintiff should forget about his children. Approximately two to three weeks later, Plaintiff located his children and Defendant, all of whom were living with Defendant's family in Westerville, Ohio. Soon after, Plaintiff filed a criminal complaint with the Dominican Republic's District Attorney and filed a civil complaint with the Santo Domingo Court of Children and Adolescents ("Santo Domingo Court"), asking that court to terminate Defendant's guardianship. On July 14, 2005, the Santo Domingo Court ordered the children and Ms. Taveras to appear on September 1, 2005 so that a ruling could be made regarding custody. Additionally, the Dominican Republic component of Interpol opened a file concerning the alleged abduction of the children. Plaintiff's complaint asks this Court to declare that the children are being unlawfully withheld from the country of their habitual residence, to order the children to be returned to the Santo Domingo Court for a determination of their guardianship, and to place the children in Plaintiff's custody for the express purpose of assuring their return to the Santo Domingo Court.

On September 20, 2005, this Court granted Plaintiff's request for a Temporary Restraining Order ("TRO") preventing Defendant from removing the two children from Franklin County, Ohio, without prior approval from the Plaintiff and this Court, and scheduled a Preliminary Injunction hearing for September 29, 2005. Defendant failed to appear on that date, prompting this Court to issue a Show Cause Order requiring Defendant to appear on October 17, 2005 to explain why she should not be held in contempt. Ms. Taveras again failed to appear

although she had, through counsel, answered the Complaint and filed a Motion to Dismiss. On October 17, 2005, this Court found Defendant in civil contempt of court and ordered her to pay costs associated with Plaintiff's travel and attorney's fees.[1] This Court rescheduled a hearing for October 25, 2005. On that day, all parties appeared with their respective counsel and this Court heard arguments on Defendant's Motion to Dismiss. Since that time, Defendant has filed a written reply to Plaintiff's Response to the Motion to Dismiss. Thus, this matter is now ripe for disposition.

### III. ANALYSIS

Plaintiff's initial complaint suggested that this Court had jurisdiction under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610, which was enacted to implement the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"). Defendant moves to dismiss, asserting that the Dominican Republic was not a signatory to the Hague Convention; thus, leaving this Court without jurisdiction. Plaintiff counters that this Court has jurisdiction on three grounds. First, Plaintiff argues that the Dominican Republic is, in fact, a signatory to the Hague Convention. Second, Plaintiff contends that the Court has jurisdiction under the Alien Tort Statute, 28 U.S.C. § 1350. Third, Plaintiff asks this Court to find jurisdiction under 28 U.S.C. § 1331.[2]

---

[1] In light of Ms. Taveras's and her brother's testimony on October 25, 2005, the Court finds Ms. Taveras was unaware of the scheduled hearings. Therefore, Defendant's Motion to Set Aside the Contempt Finding is **GRANTED**. [Docket No. 13].

[2] Plaintiff also appears to be asking this Court to find jurisdiction because doing so would be in the children's best interests. Plaintiff argues that the children should be returned to their "home country before they become further enmeshed in the culture and lifestyle of a country in

-3-

### A. The Hague Convention

The United States became a party to the Hague Convention on the Civil Aspects of International Child Abduction on July 1, 1988.  *See* Exec. Order No. 12,648, 53 Fed. Reg. 30, 637 (1988).  Shortly thereafter, Congress implemented the Hague Convention in the United States by enacting the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610.  Defendant argues that this Court has no jurisdiction under 42 U.S.C. § 11603, which states:  "The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention."  Because the Dominican Republic is not a party to the Hague Convention, Defendant argues that this Court is without jurisdiction.

Plaintiff counters that the Dominican Republic acceded to the Hague Convention on August 11, 2004 and its provisions went into effect there on November 1, 2005.[3]  Plaintiff concedes, however, that Article 38 requires these new signatories to request acceptance from each contracting state:

> The accession will have effect *only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession*. Such a declaration will also have to be made by any Member State ratifying, accepting or approving the Convention after an accession.
>
> \*\*\*
>
> The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the first day of the third calendar month after the deposit of the declaration of acceptance.

---

which they have no legal status," emphasizing that the children are not eligible to become legal residents until 2010.  *Pl.'s Resp.* at 8.  While this argument may be persuasive in a custody case, it does not cure this Court's jurisdictional problem.

[3]Article 37 of the Hague Convention provides that the Convention will be "open for signature."

Hague Convention, Article 38 (emphasis added).

It is undisputed that the United States and the Dominican Republic have not entered into the negotiations required by Article 38. Consequently, the Convention's administrative and judicial mechanisms are not yet applicable with regard to relations between the two countries. *See Gonzalez v. Gutierrez*, 311 F.3d 942, 945 (9th Cir. 2002) ("Accession . . . binds a country only with respect to other nations that accept its particular accession under Article 38.") (citing Lynda R. Herring, *Taking Away the Pawns: International Parental Abduction & the Hague Convention,* 20 N.C.J. INT'L L. & COMM. REG. 137, 138 n.8 (1994)); *see also* Dep't of State, Hague Int'l Child Abduction Convention Text and Legal Analysis, 51 Fed. Reg. 10494, 10514 (Mar. 26, 1986) ("[U]nder Article 38 the Convention is open to accession by non-member States, but enters into force only between those States and member Contracting States which specifically accept their accession to the Convention.").

Plaintiff recognizes this hurdle, but argues that this Court has jurisdiction because the broad language of both Article 29 and 42 U.S.C. § 11603 preserve this Court's jurisdiction regardless of the Dominican Republic's status as a signatory. Article 29 reads:

> This Convention shall not preclude *any person*, institution or body who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention.

Hague Convention, Article 29 (emphasis added); *see also* § 11603 ("*Any person* seeking to initiate judicial proceedings under the Convention for the return of a child . . . may do so by commencing a civil action . . . in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the

petition is filed.") (emphasis added).  Plaintiff asserts that both the Convention and § 11603 retain federal court access for those persons residing in noncontracting states.

Contrary to Plaintiff's argument, the Hague Convention's scope is a limited one:  "A threshold inquiry, therefore, is whether the child who has been abducted or retained is subject to the Convention's provisions. Only if the child falls within the scope of the Convention will the administrative and judicial mechanisms of the Convention apply."  51 Fed. Reg. 10,494, 10,504.  Turning first to Article 29, it has not been interpreted as broadly as Plaintiff suggests.  *Id*. (interpreting Article 29 to "permit[ ] the person who claims a breach of custody or access rights, as defined by Articles 3 and 21, to bypass the Convention completely by invoking *any applicable laws* or procedures to secure the child's return.") (emphasis added).  In other words, the plain text of Article 29 indicates that the Convention cannot preclude a court from hearing this case provided that the court has another basis for jurisdiction.  Article 29 is not in and of itself a jurisdictional grant.

Similarly, although Mr. Taveras reads 42 U.S.C. § 11603 to allow "any person" to initiate judicial proceedings, the statute, read in full, requires that the proceeding be held "in any court *which has jurisdiction of such action*."  § 11603(b) (emphasis added).  Again, this statute is not a jurisdictional grant allowing any person into court; rather, § 11603 requires the court to have jurisdiction under the Convention.  The statute contains a section specifically stating as such:  "The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising *under the Convention*."  § 11603(a).  Thus, Plaintiff's argument pursuant to Article 29 and § 11603 is unpersuasive.

When "a child is taken from a non-signatory country and is retained in a signatory country," it is well-settled law that "there is no remedy" because the terms of the Convention "are only applicable to those countries who signed the Convention and thereby agreed to abide by its terms." *Mezo v. Elmergawi*, 855 F. Supp. 59, 62 (E.D.N.Y. 1994); *see also Mohsen v. Mohsen*, 715 F. Supp. 1063, 1065 (D. Wyo. 1989) ("In light of the fact the petitioner's daughter was last habitually resident in Bahrain, a noncontracting state, the court concludes that the petitioner has no rights under the Convention and is therefore not entitled to seek redress under its remedial provisions.").

This rather hard-line view is followed because only those countries that are signatories have an obligation to reciprocate by affording litigants the same remedies in their courts. As the Second Circuit explained in *United States v. Amer*, 110 F.3d 873, 881 (2d Cir. 1997), the Convention, by its terms, explains that "[t]he objects of the present Convention are to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, Article 1. Thus, "the Convention can operate only between two signatory states." *Amer* at 881. Because the United States has not declared its acceptance of the Dominican Republic's accession, this Court does not have jurisdiction under the Hague Convention.[4]

---

[4]Moreover, the State Department does not consider the Dominican Republic a party to the Convention. Its website reads:
> The Dominican Republic is not a party to the Hague Convention on the Civil Aspects of International Child Abduction, nor are there any other international or bilateral treaties in force between the Dominican Republic and the United States dealing with international parental child abduction.

*See* http://travel.state.gov/family/abduction/country/country_489.html

Even if the Dominican Republic were to be considered a full-fledged contracting state, the Hague Convention's Article 35 states that "this Convention shall apply as between Contracting States only to wrongful removals or retentions occurring after its entry into force in those States." *Id*; *see also* 51 Fed. Reg. 10494, 10504 ("Following a strict interpretation of that Article, the Convention will not apply to a child who is wrongfully shifted from one Contracting State to another if the wrongful removal or retention occurred before the Convention's entry into force in those States."). Plaintiff alleges that the children's removal occurred in August of 2004, approximately three months before the Dominican Republic promulgated laws enacting the Hague Convention therein. Thus, under at least one interpretation of Article 35, the Convention would not apply to children removed prior to the Convention's November 2004 enactment in the Dominican Republic.

In short, because the Dominican Republic and the United States have yet to start and/or complete their bilateral negotiations and because the children, in any event, were allegedly removed prior to the Convention's enactment in the Dominican Republic, this Court finds itself without jurisdiction.

### B. 28 U.S.C. § 1350[5]

In the alternative, Plaintiff argues that this Court has jurisdiction pursuant to 28 U.S.C. § 1350, which reads as follows:

---

[5]The Court reaches this argument pursuant to Plaintiff's Motion for Leave to File an Amended Complaint, which the Court **GRANTS** [Docket No. 17]. *See Fisher v. Roberts*, 125 F.3d 974, 977 (6th Cir. 1994) ("In absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc.--the leave sought should, as the rules require, be 'freely given.'") (citing *Foman v. Davis,* 371 U.S. 178 (1962)).

> The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States.

*Id*. Plaintiff submits that Defendant's alleged wrongful removal and retention of their children violates the "law of nations," arguing that precedent supports his position. *See Adra v. Clift*, 195 F. Supp. 857, 863(D. Md. 1961) (finding a violation of a law of nations pursuant to § 1350 when a mother concealed her daughter's name and Lebanese nationality and fraudulently included her daughter in an Iraqi passport, under which both were admitted to the United States).

This statute, often referred to as the Alien Tort Statute ("ATS") recently received an in-depth examination by the Supreme Court in *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). There, the Supreme Court considered whether the ATS, standing by itself, created a cause of action for torts that violated the law of nations, or whether the statute merely provided jurisdiction but did not authorize any cause of action without specific congressional action. Justice Souter, writing for the majority, held that the statute, passed in 1789, could, in certain limited circumstances, provide a claim for relief without any enabling statute. *Sosa* at 2755, 2761 (finding that the 1789 Congress did not enact a "stillborn" statute that required "a further statute expressly authorizing adoption of causes of action," reasoning that the "historical materials" indicated "the statute was intended to have practical effect the moment it became law").

The Supreme Court then noted that, at enactment, the statute "furnish[ed] jurisdiction for a relatively modest set of actions alleging violations of the law of nations," which included three laws of nations recognized by the common law at that time: "violations of safe conducts, infringement of the rights against an ambassador, and piracy." *Id*. at 2756. The Court then held

that the statute was still viable, but only if the proffered law of nations is similar to those laws of nations identified in 1789: "Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." *Id*. at 2761-62.

The Court then applied this standard to the set of facts before it and found 28 U.S.C. § 1350 inapplicable. The *Sosa* case involved a United States Drug Enforcement Agency ("DEA") agent who was captured in Mexico, taken to a house in Guadalajara, tortured for two days and then murdered. DEA officials believed that Humberto Alvarez-Machain ("Alvarez"), a physician, kept the agent alive for the sole purpose of inflicting additional torture. Although Alvarez was indicted in the United States, he was residing in Mexico at that time. To procure Alvarez's appearance, the DEA hired Mexican nationals, including Jose Francisco Sosa, to seize Alvarez and bring him to California. Sosa and his cohorts abducted Alvarez, held him in a hotel for one night and then brought him to Texas, where he was arrested by federal agents. Alvarez was ultimately acquitted and, upon returning to Mexico, sued Sosa under the ATS.

The Supreme Court identified the alleged law of nations as "arbitrary detention," which the court defined as "officially sanctioned action exceeding positive authorization to detain under the domestic law of some government, regardless of the circumstances." *Id*. at 2768. To determine whether "arbitrary detention" constituted a law of nations deserving of a private tort cause of action, the Court outlined a two-prong test that, first, asked whether the alleged law related back to one of the three original laws of nations identified in the late eighteenth century and, second, considered the practical implications of recognizing the cause of action:

> [W]e are persuaded that federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted. . . . And the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts.

*Id*. at 2765-66.  The Supreme Court then concluded that a "single detention of less than a day, followed by a transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id*. at 2769.  The Court also rested its determination on the disastrous consequences that would result if the suggested "law of nations" were implemented:  "[I]ts implications would be breathtaking.  His rule would support a cause of action in federal court for any arrest, anywhere in the world, unauthorized by the law of the jurisdiction in which it took place, and would create a cause of action for any seizure of an alien in violation of the Fourth Amendment . . . ."  *Id*. at 2768.

      Turning to the instant case, the test's first prong asks whether inter-country abduction violates international norms.  The Hague Convention indicates that the wrongful removal or retention of children is a serious problem that several countries agree must be handled in a civilized and consistent manner.  *See* Hague Convention, Preamble (explaining that the Convention arose out of a "desire to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ").  Plaintiff's claims of wrongful removal and retention allege that Defendant, who Plaintiff concedes was originally awarded guardianship of the

children, has wrongfully removed the children from the Dominican Republic, thereby depriving Plaintiff of access to them.

The Court takes seriously the Supreme Court's warning to be a vigilant doorkeeper and notes that recognized laws of nations typically involve brutality. *See Filartiga v. Pena-Irala,* 630 F.2d 876, 890 (2d Cir. 1980) ("[F]or purposes of civil liability, the torturer has become-- like the pirate and slave trader before him--*hostis humani generis,* an enemy of all mankind"); *see also Enahoro v. Abubakar*, 408 F.3d 877, 884 (7th Cir. 2005) (characterizing *Sosa* as recognizing two definite violations of the law of nations: torture and killing); *Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1179, 1181 (C.D. Cal. 2005) (finding a "binding customary international law norm against extrajudicial killing" and "a customary international law norm against attacks against civilians as war crimes"). Such severe circumstances, however, are not alleged in Plaintiff's complaint. The Complaint contains no allegation that the children are in any danger--emotional or physical--or have experienced abuse of any type. *See Mujica v. Occidental Petroleum Corp.*, 381 F. Supp. 2d 1164, 1183 (C.D. Cal. 2005) (finding an international norm against "cruel, inhuman, and degrading treatment" but finding Plaintiff's allegations of such did not meet the threshold envisioned by the ATS and dismissing the claim). The Court concludes that Plaintiff's allegations do not qualify as a law of nations under 28 U.S.C. § 1350.[6]

As for the second prong, if the allegations in Plaintiff's complaint were to be considered a violation of a law nations, the practical ramifications of such a determination would be

---

[6] The Court makes explicit, however, that the severity required for a finding of a law of nations would almost certainly be present if an allegation of international child abduction involved credible allegations of physical, verbal or sexual abuse.

staggering. *See Sosa*, 124 S.Ct. at 2765-66 ("[T]he determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."). The Court does not minimize the anguish of this family dispute; however, it would be impractical to recognize these allegations as constituting an ATS claim. Doing so would permit foreign plaintiffs to litigate custody disputes in United States federal courts, thereby turning district courts nationwide into ill-suited family courts. At oral argument, Plaintiff urged this court to find jurisdiction and weigh the equities to determine whether the children should be returned to the Dominican Republic. Heeding Plaintiff's request would require this Court to conduct a full-scale investigation into the children's environment both in the United States and in the Dominican Republic, and evaluate their relationships with each parent. *See, e.g., Adra v. Clift*, 195 F. Supp. 857, 863 (D. Md. 1961) (finding, after an extensive consideration of the child's wishes, the quality of life offered by each parent, and the child's academic and social successes in each environment, that staying with the mother would be in the child's best interests).[7] Not only would this determination be a difficult one, but it would also require a much broader inquiry than that envisioned under the Hague Convention, which requires

---

[7]Although Plaintiff characterizes *Adra v. Clift* as finding the mother's alleged abduction of the child to be a violation of a law of nations, the cases's approach to 28 U.S.C. § 1350 was more complex. In *Adra*, the court found jurisdiction using a two-step process. First it identified a municipal tort: "the unlawful taking or withholding of a minor child from the custody of the parent or parents entitled to such custody." *Adra*, 195 F. Supp. at 862. Then, the court found the mother's misuse of her passport constituted a violation of the law of nations, emphasizing that use of passports must be taken seriously. *Id*. at 964-65. The *Adra* court's two-step approach to § 1350 has not been widely adopted. *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 787 (D.C. Cir. 1984) ("The *Adra* formulation adopts a two-step jurisdictional test, requiring what would appear to be a looser allegation of a law of nations offense, coupled with a municipal tort.").

a district court to abstain from hearing the merits of the custody claim. *See* Hague Convention, Article 19 ("A decision under this Convention concerning the return of the child shall not be taken to be determination on the merits of any custody issue."). Moreover, as explained by the court in *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993), balancing the equities of the custody issue would contravene the Convention's purpose:

> [A] United States district court has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim. It is important to understand that "wrongful removal" is a legal term strictly defined in the Convention. It does not require an ad hoc determination or a balancing of the equities. Such action by a court would be contrary to a primary purpose of the Convention: to preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.

*Id*.

A second practical consequence augurs in favor of dismissal: the Supreme Court's words of caution that a court's recognition of an international norm could "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Sosa* at 2763, 2766 n. 21 (noting a "possible limitation" in finding a law of nations is "a policy of case-specific deference to political branches"). In this case, providing a jurisdictional basis on which disgruntled parents from non-signatory countries could sue would undermine any incentive such nations have to join fully the Hague Convention. *See Mohsen v. Mohsen*, 715 F. Supp. 1063, 1065 (D. Wyo. 1989) ("By providing rights only when a child was habitually resident in a contract state, the Convention creates an inventive for all nations to become signatories"); *see also United States v. Amer*, 110 F.3d 873, 881 (2d Cir. 1997) (explaining that Congress has made clear that the Hague Convention is the "preferred route for resolving the complex and difficult problems surrounding international child abduction," noting that President Clinton, when passing

a criminal counterpart to the Hague Convention, stressed that the new act "should not interfere with the Convention's successful operation").  Finding jurisdiction under § 1350 in this case may detract from Congress's stated desire to encourage counties to resolve abduction issues through the Convention.

In sum, because the allegations set forth in Plaintiff's complaint lack the requisite severity and because the practical consequences are prohibitive, the Court will not recognize an alleged violation of the law of nations and thus, does not have jurisdiction pursuant to 28 U.S.C. § 1350.

### C.  42 U.S.C. § 1331

Section 1331 reads: "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." *Id*.  This statute, plaintiff argues, gives federal courts jurisdiction over federal common law.  Because international law is a part of the federal common law, plaintiff asserts, jurisdiction is proper.  In other words, Plaintiff asks this Court to find jurisdiction, regardless of the limitations under the Convention.

The Court finds this argument unpersuasive.  The laws of the United States make clear that this Court does not have jurisdiction unless said claim arises under the Convention.  42 U.S.C. § 11603 ("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising *under the Convention*.") (emphasis added).  And the Hague Convention's Article 38 states with no uncertainty that the Dominican Republic's accession "will have effect *only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession*."  *Id*.

(emphasis added).  Section 1331 does not alter this calculus and provide this Court with a jurisdictional basis.

## IV.  CONCLUSION

The Court **GRANTS** Defendant's Motion to Dismiss for Lack of Jurisdiction.

**IT IS SO ORDERED.**

    s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  November 3, 2005**